Neal Brickman, Esq. (NB 0874)
The Law Offices of Neal Brickman
317 Madison Avenue, 21st Floor
New York, New York 10017
(212) 986-6840
*Attorneys for Plaintiff Vincent Pelosi*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VINCENT PELOSI,

                Plaintiff,

- against -

SCHWAB CAPITAL MARKETS L.P. (A.K.A.,
UBS CAPITAL MARKETS) CHARLES SCHWAB
CORPORATION, THE CHARLES SCHWAB
SEVERANCE PAY PLAN,
AND UBS SECURITIES LLC,

                Defendants.
------------------------------------------------------------X

Case No.: 05 CIV 9108 (VM) (ECF Case)

**FIRST AMENDED COMPLAINT**

**(Jury Trial Demanded)**

COMES NOW the Plaintiff, Vincent Pelosi ("**Plaintiff**" or "**Pelosi**"), by and through his attorneys, The Law Offices of Neal Brickman, located at 317 Madison Avenue, New York, New York 10017, and as and for his First Amended Complaint against defendant Schwab Capital Markets L.P. (a.k.a. UBS Capital Markets), Charles Schwab Corporation, the Charles Schwab Severance Pay Plan and UBS Securities LLC, states and alleges as follows:

### NATURE OF ACTION

1.      This is an action arising under §§ 502 and 510 of the Employment Retirement Income Security Act of 1974 ("ERISA"), as codified at 29 U.S.C. 1132 and 1140, under federal precedent governing ERISA's breach of fiduciary duty provisions and under state law. Plaintiff states claims for two discrete violations of ERISA, and seeks redress under two independent remedial sections of the statute. For his first ERISA count, Plaintiff alleges that

1

he fell victim to a scheme orchestrated by the defendants to discriminate, interfere with and ultimately to deprive him of benefits to which he was entitled under an "employee welfare plan" within the meaning of ERISA. Such a scheme is expressly prohibited under § 510, which provides for several remedies. For his second ERISA count, Plaintiff separately seeks to reclaim benefits wrongfully denied through § 502(a)(1)(B) of ERISA. Specifically, Plaintiff seeks $1.4 Million in severance benefits to which he was entitled in that the decision to deny severance was contrary to the plain language of the plan, arbitrary and capricious, and erroneous as a matter of law. Third, Plaintiff alleges a cause of action for breach of fiduciary duty, cognizable under ERISA and the federal common-law of ERISA as a result of defendants' scheme. Finally, plaintiff states a state-law claim for tortious interference with his employment agreement. Plaintiff seeks equitable enforcement of the terms of the plan, restitution of benefits denied by virtue of defendants' wrongful acts, including interest, attorneys fees, as well as compensatory and punitive damages for the tortious interference claim.

## THE PARTIES

2.      Plaintiff is a natural person and U.S. citizen currently residing in Staten Island, New York.

3.      Defendant Schwab Capital Markets L.P. ("**SCM**") is a limited partnership organized and existing under the laws of the State of Delaware, with offices located within this judicial district at 1 New York Plaza, New York, New York 10004.

4.      Defendant Charles Schwab Corporation ("**Schwab**") is a corporation organized and existing under the laws of the State of Delaware, with offices located within this judicial district at 2308 Broadway, New York, New York 10024.

5.      Defendant The Charles Schwab Severance Pay Plan (the "**Plan**") was and is a unfunded, "employee welfare benefit plan" subject to and controlled by ERISA, and administered by defendant Schwab.

6.      Defendant UBS Securities LLC ("**UBS**") is a limited liability company organized and existing under the laws of the State of Delaware, with offices located within the judicial district at 666 Fifth Avenue, New York, New York 10103.

## JURISDICTION & VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and pursuant to 29 U.S.C. § 1132, because this action is presenting questions arising under ERISA. This Court also has pendent subject matter jurisdiction over Plaintiff's state law claims.

8.      Venue is properly laid in this judicial district pursuant to 28 U.S.C. § 1391 because each of the defendants reside in this judicial district, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## BACKGROUND

9.      In September 2004, Mr. Pelosi was employed in sales, as a senior vice-president for SCM, which at that time was a wholly owned limited partnership of Schwab.

10.     Employed at Schwab since 1990, Mr. Pelosi's compensation (i.e., salary) at Schwab was, and had always been, straight commissions. He received a "draw" of $300,000.00 per annum against which his commissions were credited. He was paid on what is known as a "direct drive" basis, which meant that the amount of compensation he received in any given year was determined based upon a fixed percentage of the sales he made during the year. Mr. Pelosi also received stock options, perks, and a comprehensive benefits

package which included medical, dental, life, and disability insurance, a 401(k) savings plan, parking privileges, and other benefits.

11. A family man with school-aged children, Mr. Pelosi lived with his family in Staten Island, New York, and commuted to work at Schwab's offices in Jersey City, New Jersey.

12. As of October 2004, Mr. Pelosi's year-to-date compensation had already exceeded $1,089,299 and his anticipated year-end compensation from Schwab was expected to exceed $1.178 million. In fact, as of December 31, 2004, Mr. Pelosi was paid in excess of $1.4 million as a result of his employment as a vice-president for SCM.

13. In mid-2004, Schwab announced its intention to "sell" SCM to UBS in a transaction expected to close on or about November 1, 2004.

14. Mr. Pelosi was advised by Schwab that if UBS intended to continue his employment after the closing, UBS would make him an employment offer for a comparable position. Mr. Pelosi understood from Schwab that it was working together with UBS, in connection with proposed sale of SCM, such that his employment after the proposed sale would be comparable to his employment prior to the sale, if UBS desired and intended to continue utilizing his services after the sale. Mr. Pelosi also understood from conversations with Schwab's human resources personnel that, in the event that he was not offered a post-closing position which was comparable in all material respects, then he would receive severance benefits—based upon his 15 years of service—under the Plan equal to his last full year's compensation of approximately $1.4 million.

15. Based upon Schwab's representations and also upon the plain meaning of certain provisions in the Plan, Mr. Pelosi understood that if UBS did not offer him a comparable

4

position, his employment with Schwab would be deemed to have been involuntarily terminated in a manner which would entitle him to severance benefits under the Plan which included, without limitation, payment of his compensation as well as COBRA expenses.

16.	By letters dated September 28, 2004 and October 5, 2004, UBS offered Mr. Pelosi a post-closing position with SCM that was not comparable to Mr. Pelosi's then current position.

17.	Upon information and belief, the post-closing position was offered under an agreement by and between UBS and Schwab designed to deprive Mr. Pelosi of his severance benefits by offering him non-comparable employment disguised to look like comparable employment. In contrast, other Schwab employees—those to whom Schwab and UBS had determined to pay severance—were never formally offered post-closing employment by UBS, and/or were not offered disguised, non-comparable post-closing employment by UBS.

18.	For example, UBS's non-comparable offer to Mr. Pelosi was to pay him a salary of $175,000, which was little more that half the amount of the draw-against commissions which Mr. Pelosi was receiving from Schwab at the time. Instead of the uncapped direct-drive compensation that Mr. Pelosi was then receiving from Schwab (which was anticipated to net Mr. Pelosi $1.4 million in annual compensation), UBS offered him only a one year conditional "guaranteed," discretionary bonus that was subject to "EOP" vesting and, as a result, may or may not ever have been paid. The offer contained no " guarantees" after one year could have well resulted in Pelosi's being paid a total of $175,000 in subsequent years—or a little more than 10% of his pre-closing compensation

19. The offer from UBS included a non-competition / non-solicitation provision which would have materially restricted Mr. Pelosi's ability to earn a living, in the event that UBS terminated his employment following its acquisition of SCM.

20. Furthermore, the UBS offer required Mr. Pelosi to commit to working in locations as far away as Stamford, Connecticut, which would have required him to relocate his family to the detriment of his school-aged children.

21. Simply put, the job offered to Mr. Pelosi by UBS was materially different than the job he then had at SCM: It carried a compensation arrangement that was grossly inferior, it entailed the likely unwanted physical relocation, and it was tied to untenable post-employment restrictions. Upon information and belief, the reason why Mr. Pelosi was being made such an offer was because he was being victimized as part of a conspiracy by and between Schwab and UBS under which he was treated differently than other SCM employees who were similarly situated.

22. Disturbed by the manner in which he was being treated, Mr. Pelosi contacted Schwab. Mr. Pelosi notified Schwab that the UBS offer was not comparable, expressed his intention to reject the UBS offer, and made inquires into the severance benefits he would receive under the Plan.

23. Schwab and UBS advised Mr. Pelosi that unless he immediately accepted the UBS offer, Schwab and UBS would deem Mr. Pelosi to have accepted the UBS offer and then terminate his employment with UBS for an alleged failure to report to work.

24. Schwab and UBS then endeavored wrongfully to strong-arm Mr. Pelosi into accepting the UBS offer by, among other tactics, threatening to falsely report on his NASD Form U-5 that Mr. Pelosi's employment was terminated "for cause," further improperly

hindering Mr. Pelosi's ability to find new employment and interfering with Mr. Pelosi's efforts to exercise his protected rights and interests.

25. Upon information and belief, Schwab and UBS had entered into a conspiracy to tortiously force Mr. Pelosi to accept a post-closing employment position which was inferior to his pre-closing employment with SCM, and materially non-comparable.

26. Upon information and belief, working together in an unlawful, tortious combination, Schwab and UBS intentionally interfered with Mr. Pelosi's contractual rights and interests, as well as his prospective economic advantage, arising from and through his long-term employment with SCM. Upon information and belief, Schwab was operating under and was burdened by a conflict of interest arising out of Schwab's relationship with UBS and Schwab's predetermined severance obligations regardless of the facts.

27. Upon information and belief, Schwab and UBS devised, implemented, and executed a scheme through which they gave disparate, preferential treatment and superior benefits to certain Schwab employees impacted by the proposed sale of SCM to UBS, while those defendants knowingly and intentionally denied equal treatment and benefits to others, including Mr. Pelosi.

28. Upon information and belief, the defendants caused UBS to make "soft" and/or informal post-closing employment offers to certain, favored employees of Schwab. Upon information and belief, in the event that such a "soft" and/or informal offer was rejected, UBS refrained from making a formal post-closing employment offer to the employee thereby permitting that employee to receive full severance benefits under the Plan.

29. Upon information and belief, the defendants caused UBS to make Mr. Pelosi a formal post-closing employment offer which was materially inferior and non-comparable to

his existing employment with SCM, for the purpose of interfering with, prejudicing, and denying Mr. Pelosi full severance benefits under the Plan.

30. Based upon these and other circumstances, Mr. Pelosi considered his employment with Schwab to have been terminated.

31. As a result, Mr. Pelosi was not employed in "the same or substantially similar position" as of the closing date of the transaction between Schwab and UBS.

32. Moreover, Mr. Pelosi was never offered a "Comparable Position" by UBS in connection with the SCM acquisition.

33. Schwab failed to carry or materially satisfy its duty and obligation to give relevant notice and notification under the Plan including, without limitation, the notice required under ARTICLE 5.

34. Based upon his belief that as a result of the forgoing he was entitled to benefits under the Plan, Mr. Pelosi made a claim for severance benefits to SCM, Schwab and/or its agents administering the Plan, which claim Schwab denied by letter dated January 26, 2005.

35. On or about March 28, 2005, Mr. Pelosi appealed from the denial of his claim for severance benefits, by letter addressed to the Review Panel of the Plan, which appeal also was rejected by Schwab. Having exhausted each of his administrative remedies, Mr. Pelosi now commences this action.

36. As a direct and proximate result of the foregoing, Mr. Pelosi has suffered, and is continuing to suffer, injury and damages which include but are not limited to unpaid benefits and other forms of consequential damages such as attorney's fees and costs.

## AS AND FOR A FIRST CAUSE OF ACTION
(Violation of Section 510 of ERISA As Against Defendants Schwab, UBS and SCM )

37.     Plaintiff incorporates by reference paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.     Pelosi's right to severance pay under the Plan constitutes a right governed by and arising under ERISA, as the Plan is an ERISA benefit plan within the meaning of 29 USC § 1002(1).

39.     Defendants engaged in an unlawful scheme whereby Pelosi could be stripped of valuable ERISA benefits, by extending an illusory, non-comparable offer of employment so as to deprive Pelosi of his eligibility under the plan. Other similarly-situated employees were given "soft" offers which did not trigger ineligibility under the defendants' improper interpretation of the Plan. Through this scheme, the defendants were able to engineer a denial of benefits under the Plan with respect to some employees---including Pelosi---by falsely designating them as "ineligible" for severance, when in fact Pelosi and others were at all relevant times eligible for benefits under the plain language of the plan.

40.     The actions of the defendants were calculated, concerted and evince substantial planning. As such, defendants had the requisite specific intent to interfere with---and in fact eliminate---Pelosi's ability to exercise his rights under the Schwab Plan.

41.     Further, the defendants violated the plain language of § 510 by threatening to terminate Pelosi and to damage his U-5 disclosure if he did not accept the non-comparable offer of employment calculated to deprive him of ERISA benefits.

42.     As if that were not enough, Plaintiff was ultimately terminated as a result of his attempts to exercise his rights under and enforce the plain terms of the Plan. Defendants

actions therefore constituted conduct which is proscribed under § 510, specifically, and under ERISA generally.

43. The aforementioned acts and omissions of the defendants constitute conduct which unlawfully discriminated against Mr. Pelosi vis à vis other similarly situated employees, unlawfully interfered with Mr. Pelosi's right to benefits under the Plan, and ultimately stripped him of his ability to exercise those benefits.

44. Upon information and belief, Defendants acted with "specific intent" to deprive Pelosi of an ERISA benefit, to discriminate and interfere with his exercise of rights under the Plan, and, as such, are liable under § 510 of ERISA.

45. Through the acts and omissions of their respective officers, employees and agents, and as a direct and proximate result thereof, the defendants, individually and/or as a group, caused injury and damage to Mr. Pelosi which include but are not limited to lost benefits and lost interest, as well as attorney's fees and costs.

46. Plaintiff is entitled to equitable enforcement of the terms of the plan pursuant to § 502(a)(3) of ERISA. Mr. Pelosi is entitled to benefits under the Plan, which benefits include, but are not limited to, the payment of compensation at least equal to an additional 12-months severance pay, plus COBRA premium payments, and other benefits, in a total amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
**(ERISA Section 502 Wrongful Denial Claim Against Defendants Schwab and the Plan)**

47. Plaintiff incorporates by reference paragraphs 1 through 46 of this Complaint as if fully set forth herein.

48.     Upon information and belief, in its review and denial of Mr. Pelosi's benefits claim Schwab was operating under a conflict of interest arising from its conspiracy with UBS, subjecting Schwab's denial of benefits to *de novo* review in this action.

49.     Alternatively, in the event that it is determined that Schwab was not operating under a conflict of interest, Schwab's denial of benefits was arbitrary and capricious in that the administrator ignored the mandatory terms of the plan, discounted the relevant factors, and enforced the terms of the plan in a disparate, discriminatory fashion. .

50.     Mr. Pelosi was entitled to severance benefits under the plain terms of the Plan, by virtue of the fact that he was never extended a comparable offer of employment by UBS. Such benefits included, but were not limited to, the payment of compensation at least equal to an additional 12-months severance pay, plus COBRA premium payments, and other benefits.

51.     Defendants wrongfully declined Mr. Pelosi's claim for benefits.

52.     Mr. Pelosi exhausted his administrative remedies under the Plan. Alternatively, further attempts by Mr. Pelosi to exhaust administrative remedies would have been futile.

53.     Through the acts and omissions of their respective officers, employees and agents, and as a direct and proximate result thereof, SCM, Schwab, and/or the Plan, caused injury and damage to Mr. Pelosi which include but are not limited to lost benefits and lost interest, as well as attorney's fees and costs.

### AS AND FOR A THIRD CAUSE OF ACTION
(Tortious Interference As Against UBS)

54.     Plaintiff incorporates by reference paragraphs 1 through 53 of this Complaint as if fully set forth herein.

55. There existed a valid contract (the "Contract") between Mr. Pelosi, SCM and/or Schwab, pursuant to which Mr. Pelosi was entitled to receive compensation.

56. The Contract was supported by good and valuable consideration, and was fully enforceable under applicable law.

57. The existence and terms of the Contract were known to defendant UBS.

58. Upon information and belief, UBS entered into and engaged in a wrongful conspiracy with Schwab with the intention, purpose, and objective of tortiously interfering with Mr. Pelosi's rights and interests under the Contract.

59. UBS, acting by and through its officers, employees and/or agents, intentionally and without justification procured a material breach of the Contract and/or, alternatively, interfered with Mr. Pelosi's prospective economic advantage.

60. As a direct and proximate result of the wrongful acts and omissions of UBS, Mr. Pelosi has suffered, and is continuing to suffer, injury and damages.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty As Against All Defendants)**

61. Plaintiff incorporates by reference paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. Each and every one of the defendants owed a fiduciary duty to Mr. Pelosi.

63. Alternatively, to the extent that defendant UBS is not a traditional ERISA fiduciary, it is a constructive co-fiduciary by virtue of its participation in fiduciary breeches by Schwab and the Plan.

64. The defendants intentionally breached, or, alternatively, negligently breached, their respective fiduciary duties to Mr. Pelosi.

65.  As a direct and proximate result of foregoing, Mr. Pelosi has suffered, and is continuing to suffer, injury and damages.

## JURY DEMAND

Plaintiff hereby respectfully requests that, to the maximum extent permitted under applicable law, his claims be tried before a jury.

**WHEREFORE**, Plaintiff, VINCENT PELOSI, demands judgment against each of the defendants, jointly and severally to the extent applicable, as follows:

1. For equitable enforcement of the terms of the plan through disbursement of the severance benefits through restitution, constructive trust or the specific performance of terms remedy included in § 502(a)(3)(B) and for pre and post judgment interest;

2. For compensatory damages arising from the tortious interference claim in an amount to be determined at trial; but in no event less than Four Hundred Thousand Dollars ($400,000.00);

3. For punitive damages in an amount to be determined at trial; but in no event less than Three Million Dollars ($3,000,000.00);

4. For reasonable attorneys' fees and costs of suit incurred in connection with the commencement and prosecution of this action; and

5. Such other and further relief as equity and justice may require.

Dated:  New York, New York
        March 7, 2006

Neal Brickman (NB 0874)
The Law Offices of Neal Brickman
317 Madison Avenue – 21st Floor
New York, New York 10017
(212) 986-6840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
VINCENT PELOSI.,

                Plaintiff,      Case No. 05CV9108 (VM)

- against -

                                **AFFIDAVIT OF SERVICE**

SCHWAB CAPITAL MARKETS L.P. A.K.A.
UBS CAPITAL MARKETS., CHARLES
CORPORATION, THE CHARLES SCHWAB
SEVERANCE PAY PLAN, AND UBS
SECURITIES LLC.,

                Defendants.
- - - - - - - - - - - - - - - - - x

STATE OF NEW YORK  }
                           ss.:
COUNTY OF NEW YORK }

        IDRIS MAHMOUD, being duly sworn, deposes and says that he is over the age of 18 years; is not a party to this action and resides within the State of New York. That on March 7, 2006, he served the within a FIRST AMENDED COMPLAINT upon the attorneys for defendants, by placing a true copy of the same in a postpaid wrapper in an official United States Post Office receptacle, duly addresses as follows:

                Prasanth R. Akkapeddi, Esq.
                Matthew Eastabrook, Esq,
                Eugene Scalia, Esq.
                Gibson, Dunn & Crutcher LLP
                Attorneys for the UBS Defendants
                200 Park Avenue, 47th Floor
                New York, NY 10166
                    and
                Gary Glaser, Esq.
                Anjanette Cabrera, Esq.
                Seyfarth & Shaw
                Attorneys for Charlas Schwab Corporation
                1270 Avenue of the Americas-Suite 2500

                                                  _Idris Mahmoud_
                                                  IDRIS MAHMOUD
                                                  LIC #1151131

Sworn to before me this
7th day of March , 2006

_Jacquelyn E. Ford_
NOTARY PUBLIC

JACQUELYN E. FORD
Notary Public, State of New York
No. 01FO4851616
Qualified in Orange County
Commission Expires February 3, 2010