```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
VINCENT PELOSI,                     :
                                    :
                                    :
                     Plaintiff,     :   05 Civ. 9108 (VM)
                                    :
                                    :
        - against -                 :   DECISION AND
                                    :   AMENDED ORDER
                                    :
SCHWAB CAPITAL MARKETS, L.P.        :
(a/k/a UBS CAPITAL MARKETS)         :
et al.                              :
                                    :
                     Defendants.    :
------------------------------------X
```

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-30-09

**VICTOR MARRERO, United States District Judge.**

Plaintiff Vincent Pelosi ("Pelosi") filed an amended complaint in this action on March 7, 2006, asserting four causes of action relating to severance benefits allegedly denied him by defendants Charles Schwab Corporation ("Schwab") and Charles Schwab Severance Pay Plan (the "Plan") (collectively "Defendants") following a decision by the Plan's Administrator that Pelosi was ineligible for benefits. Defendants moved to dismiss the action, and the Court granted that motion in part and denied it in part,[1] allowing further proceedings only with respect to Pelosi's cause of action under the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(a)(1)(B) seeking recovery of benefits

---

[1] The Court's decision is reported as Pelosi v. Schwab Capital Mkts. L.P., 462 F. Supp. 2d 503 (S.D.N.Y. 2006).

allegedly wrongfully denied to him. Defendants now move for summary judgement on Pelosi's remaining cause of action.

After consideration of the papers submitted by the parties, the Court issued an order on March 20, 2009 (the "March 20 Order"), granting Defendants' motion for summary judgment. The Court now sets forth its findings, reasoning and conclusions in support of the March 20 Order.

## I. BACKGROUND[2]

From 1990 until October 29, 2004, Pelosi was employed by an entity known as Schwab Capital Markets ("SCM"), a former subsidiary of Schwab, located in Jersey City, New Jersey. In mid-2004, Schwab announced its intention to sell SCM to UBS Securities LLC ("UBS"). Under the Plan, Pelosi would be entitled to severance benefits if he met the prerequisites for eligibility and if he suffered a "Job Elimination." The terms of the Plan provided that employees would not be deemed to have suffered a "Job Elimination" if, in connection with a sale of a portion of the business, they were offered comparable employment, as defined by the Plan, by the purchasing corporation.

---

[2] The factual recitation below derives from Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, dated August 22, 2008 ("56.1 Statement") and Plaintiff's Counter-Statement of Facts in Response to Defendants' Statement of Fact Pursuant to Local Rule 56.1, dated October 10, 2008 ("Counter 56.1 Statement") and the documents attached thereto or referenced therein. Except where quoted or otherwise specifically cited, no further reference will be made to these documents. This recitation assumes familiarity with the factual background provided in the Court's earlier opinion in this case. See Pelosi, 462 F. Supp. 2d 503.

Pelosi was offered a position to continue as a sales trader after the sale of SCM to UBS. Pelosi expressed his opinion that the terms of the UBS offer were not comparable with his position at SCM and negotiations continued between Pelosi and UBS. Pelosi was notified that if he did not expressly reject UBS's offer of employment, he would automatically become a UBS employee by operation of law on the closing date of the sale of SCM to UBS.

On October 28, 2004, Pelosi sent a letter to management at both Schwab and UBS, refusing to accept the conclusion that he would become a UBS employee upon the closing date of the sale, listing his reasons for finding the UBS position to be non-comparable with his SCM position and stating that he was seeking severance benefits from the Plan. The sale of SCM to UBS was completed on October 29, 2004. By letter dated November 3, 2004, Karla Daly, executive director of human resources for UBS, responded to Pelosi's October 28 letter and explained that he had in fact become a UBS employee on October 29 and that if he refused to report to work by November 8, 2004, he would be deemed to have voluntarily resigned from his position. Pelosi never reported to work following the closing date of the sale.

By letter dated January 26, 2005, Schwab denied Pelosi's claim for benefits under the Plan. Pelosi's appeal of this decision was denied by the Plan's review panel (the "Review

-3-

Panel") on or about March 26, 2005.

Pelosi then instituted this action, asserting four causes of action and seeking redress for Defendants' alleged denial of Pelosi's benefits and alleged interference with Pelosi's rights under the Plan. The only cause of action that survived Defendants' motion to dismiss was Pelosi's claim for wrongful denial of his severance benefits under ERISA. ERISA § 502(a)(1)(B) expressly allows a participant or beneficiary of a plan to bring a civil action "to recover benefits due to him under the plan." 29 U.S.C. § 1132(a)(1)(B). In its decision on the motion to dismiss, the Court determined that Pelosi had sufficiently alleged the initial requirements to maintain a claim pursuant to ERISA § 502(a)(1)(B). Defendants now seek summary judgment on that claim.

## II. DISCUSSION

### A. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the evidence "show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The

role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no genuine issue of material fact exists, or that because of the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (quoting Fed. R. Civ. P. 56(c))).

B.  **STANDARD OF REVIEW FOR ERISA PLAN ADMINISTRATOR'S DECISION**

With respect to an ERISA plan, "[w]here the plan provides ... the administrator or fiduciary <u>discretionary authority</u> to determine eligibility for benefits, trust principles make a <u>deferential standard</u> of review appropriate." McCauley v.

First Unum Life Ins. Comp., 551 F.3d 126, 131 (2d Cir. 2008) (citing Metropolitan Life Ins. Comp. v. Glenn, 128 S. Ct. 2343, 2347-48 (2008)) (emphasis in original). In this case, "[i]t appears undisputed, and a review of the Plan confirms, that the administrator did have discretionary authority under the Plan." Pelosi, 462 F. Supp. 2d at 510. However, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." McCauley, 551 F.3d at 131 (citing Glenn, 128 S. Ct. at 2347-48) (emphasis in original).

Pelosi alleges that the Plan administrator, Ellen Jacobs ("Plan Administrator"), was operating under a conflict of interest when she denied Pelosi's claim for severance benefits. Pelosi claims that Schwab was in dire financial circumstances and had decided to sell SCM to UBS in order to raise capital. He contends that the Plan Administrator, who was employed as the vice president of human resources at Schwab, was motivated to "spend as little of this new found capital as possible in paying off former employees." (Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated October 10, 2008 ("Opp. Mem."), 16.) Pelosi also alleges that a conflict of interest existed because of Schwab's desire to have its top performers, like Pelosi, work at UBS following the sale. He contends that

Schwab employees pressured him to accept the UBS offer because they believed that this would help ensure a successful sale. The Court finds these allegations to be conclusory and finds that Pelosi has not offered adequate evidentiary support for the conflicts he asserts. Further, there is no evidence establishing that the Schwab employees Pelosi claims pressured him to accept the UBS offer were involved in the decision about Pelosi's benefits under the Plan.

With regard to the first conflict Pelosi alleges, the Supreme Court recently held that "the fact that a plan administrator both evaluates ... and pays benefits creates" a conflict of interest that should be considered when evaluating that administrator's decision regarding an individual's benefits. Glenn, 128 S. Ct. at 2348. However, the existence of this type of conflict does not change the standard of review from deferential to de novo. See id. at 2350. In these circumstances, the court is to "apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time ... tak[ing into] account ... the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." Id.

Therefore, even without making a finding as to Pelosi's claim that Schwab was in "dire" financial condition, the Court, when reviewing the Plan Administrator's decision, will

consider the extent of any conflict that existed. The Court will review the Plan Administrator's denial of Pelosi's benefits under the deferential standard, while taking into account the conflict of interest that existed because the Plan Administrator both determined who would be eligible for benefits and paid those benefits. "Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" McCauley, 551 F.3d at 132 (citing Pagan v. NYNEX Pension Plan, 52 F.3d at 438, 441 (2d Cir. 1995)).

C.   JOB ELIMINATION UNDER THE PLAN

Schwab asserts that, under the terms of the Plan, a party is eligible to receive severance benefits if he or she satisfies three requirements: (1) the party must have suffered a "Job Elimination;" (2) the party must have remained employed by a "Participating Company" at the time he received a "Notice of Eligibility" for benefits; and (3) the party must have signed and not revoked a "Severance Agreement." The Plan defines "Job Elimination" in Article 2.H:

> [A]n involuntary termination of employment on account of changes in the Company's operations or organization, as determined by the Administrator in its sole discretion. Notwithstanding anything to the contrary contained herein, a Job Elimination shall not result (i) from an Employee's termination of employment on account of voluntary resignation, retirement or death prior to

>    notice to the Employee of eligibility for Severance
>    Benefits due to a Job Elimination; (ii) if the Company or
>    any successor employer has offered the Employee a
>    "Comparable Position" (the administrator shall have the
>    sole discretionary authority to determine whether a
>    position is a "Comparable Position" under this paragraph
>    taking into account such factors as it deems appropriate
>    including without limitation the similarity of duties,
>    similarity of exempt or nonexempt status, salary range
>    and any increase in the commuting distance to the
>    employee's principal place of employment); ... (v) where,
>    in connection with a merger, acquisition, spin-off, stock
>    sale, sale of assets or portions of a business, or any
>    other corporate transaction (a "Corporate Transaction"),
>    an Employee is employed in the same or a substantially
>    similar position at the closing of the Corporate
>    Transaction or the Employee is offered a "Comparable
>    Position" (as defined above).

(The Charles Schwab Severance Pay Plan, as of September 14, 2004 ("Plan Doc.") Art. 2.H., attached as Ex. E-6 to Declaration of Gary Glaser, Esq., dated August 22, 2008 ("Glaser Dec.").)

Defendants argue that Pelosi did not meet any of the criteria for eligibility under the Plan. First, he was deemed to have voluntarily resigned from a position at UBS. Thus, he did not suffer a "Job Elimination" and he was not employed by a "Participating Company" at the time his employment ended. In addition, he never received a "Notice of Eligibility" and he did not sign a "Severance Agreement" as required under the Plan. Defendants assert that the comparability of the UBS position is irrelevant because Pelosi did not meet the prerequisites for eligibility under the Plan. However, should the Court analyze the comparability of the two positions,

Defendants argue that the position Pelosi was offered at UBS was comparable to his position at SCM, and that this also means that he did not suffer a "Job Elimination" under the terms of the Plan.

Defendants raised similar arguments in their motion to dismiss. The Court rejected Defendants' arguments regarding the "Notice of Eligibility," "Participating Company" and voluntary resignation in its decision and order on Defendants' motion to dismiss. The Court focused on the comparability of the two positions and concluded that "if the record indicates that the terms and conditions of the UBSCM offer were in no way comparable to his SCM position, it may substantially undercut the reasonableness of the Plan administrator's determination that Pelosi was offered continued employment and was thus ineligible for benefits." Pelosi, 462 F. Supp. 2d at 511. The Court went on to examine a case with similar factual circumstances, Boss v. Advanstar Communications, Inc., 911 F. Supp. 109 (S.D.N.Y. 1995). There the plan provided that an employee would not be eligible to receive severance benefits if he or she was offered employment with a buyer-corporation following the sale of the employer. The court in Boss held that what was reasonably meant by the plan's language was that the employee would not receive severance benefits if the buyer offered "reasonably comparable" employment to the employee of the seller. Id. at 112. In Pelosi's case, the Court

previously concluded that

> the language of the Plan specifically defines a "Comparable Position," and common sense would dictate that if Pelosi was not offered a comparable position (or "the same or a substantially similar position"), he should fall within the definition of "Job Elimination" under the Plan. To credit the Schwab Defendants reading of the Plan would allow them to deny an employee severance benefits in connection with a Corporate Transaction under any circumstances in which that employee did not want to accept the post-closing job offer, "even if offered occasional employment by the new owner as a janitor at the minimum wage." Such a reading of the Plan would clearly defeat its intended purpose.

Pelosi, 462 F. Supp. 2d at 511 (citing Boss, 911 F. Supp. at 112).

The Court then determined that it would not dismiss Pelosi's claims for recovery of benefits under ERISA § 502 (a)(1)(B), and set forth the task Pelosi would face in order to prevail on the merits of his remaining claim: "If Pelosi can provide substantial evidence in support of his allegation that the [UBS] offer was materially non-comparable, Pelosi may be able to demonstrate that the Plan administrator's decision was without reason or otherwise unwarranted." Id. The Court finds that Pelosi has not produced sufficient evidence to satisfy this burden and that Defendants have adequately demonstrated that the UBS position was comparable and that no genuine issues of material fact remain regarding this question. Accordingly, the Court grants Defendants' motion for summary judgment.

The Plan states that the Plan Administrator has

discretion to determine if the offered employment constitutes a "Comparable Position" by considering factors such as (i) "similarity of duties", (ii) "similarity of exempt or nonexempt status," (iii) "salary range" and (iv) "increase in the commuting distance to the employee's principal place of employment." (Plan Doc. at Art. 2.H.) Pelosi's concerns regarding the UBS offer focused on the change in the total amount and structure of his compensation; the possibility that he would have to work in the Stamford, Connecticut office for some time each month and might eventually have to relocate there permanently; the loss of participation in Schwab's stock plan; the requirement that Pelosi sell research for UBS; and the restrictions regarding the employment he could seek upon leaving UBS. Defendants assert that Pelosi's concerns were addressed by UBS when it revised the terms of its offer to Pelosi. Defendants conclude that the final employment offer was comparable to Pelosi's employment at SCM.

The Review Panel that denied Pelosi's appeal found the UBS position comparable to the SCM position.[3] They determined that the compensation Pelosi was offered was in the same range

---

[3] The Review Panel stated that the "Comparable Position" clause was not relevant to Pelosi's claim because he failed to meet other prerequisites for eligibility. However, the Review Panel did address the comparability of the UBS and SCM positions, finding them to be sufficiently similar, as an alternative basis for denying Pelosi's claim. The Court agrees with the Review Panel's assessment that Pelosi did not suffer a "Job Elimination" because he was offered a comparable position with UBS and the Court does not address the additional bases for the Review Panel's denial of Pelosi's claim.

as the compensation he earned at SCM. They noted that under the terms of the UBS offer Pelosi was guaranteed to earn at least $1 million in 2005, with the potential for an additional discretionary bonus, which they determined was similar to what he made at SCM. They also did not credit Pelosi's complaints about a potential relocation to Stamford, noting that UBS had not asked Pelosi to relocate immediately following the closing date of the sale. Lastly, they rejected Pelosi's concerns about the post-employment restrictions contained in the UBS offer because they determined that these provisions "merely recognized Mr. Pelosi would have access to confidential and proprietary information and trade secrets of UBS and sought to protect that information and those trade secrets and narrowly limited his ability to accept employment with a competitor." (Letter from Ellen Jacbos, dated May 26, 2005 ("Review Panel Letter"), attached as Ex. E-5 to Glaser Dec.)

Pelosi argues that UBS's offer of employment was not comparable because it would have required him to commute to Stamford, Connecticut once a month and there was a possibility that he might be asked to relocate there permanently in the future. UBS communicated to Pelosi that his position was not being moved to Stamford upon the closing of the sale, but it was not willing to promise that a relocation would not occur in the future. Pelosi admits, however, that UBS's final employment offer provided that if his position was relocated

-13-

to Stamford and he chose to terminate his employment for any reason, he would be eligible for severance under the UBS severance benefit plan. (Counter 56.1 Statement ¶ 14.) UBS had also offered to reimburse Pelosi for commuting expenses or relocation expenses. The Review Panel noted that they understood from UBS that none of the SCM employees had been required to relocate.

The parties disagree as to what the structure of Pelosi's compensation was at SCM, but they agree that the structure would have changed under UBS's employment offer. Pelosi asserts that he was paid by SCM purely on commission. Defendants assert that Pelosi received a base salary plus commissions from SCM. The parties also dispute the total amount Pelosi earned from SCM in 2004. In 2004, during which Pelosi worked only ten months for SCM, he claims to have earned $1.4 million. The Review Panel stated that Pelosi earned only $498,084 at SCM in 2004, $1,279,543 in 2003 and $989,351 in 2002.

Under the terms of the UBS offer, Pelosi was to receive $175,000 in base salary annually in addition to a bonus. For 2004, Pelosi was guaranteed a minimum bonus of $825,000, prorated to reflect the fraction of that year Pelosi was employed by UBS. For 2005, Pelosi was guaranteed a minimum bonus of $825,000. In addition, he was to receive compensation in the form of an "Equity Ownership Plan" award.

-14-

The Review Panel determined that Pelosi was "guaranteed to earn at least $1,000,000 for 2005," an amount that it found was within Pelosi's salary range at SCM. (Review Panel Letter 5 (emphasis in original).)

Pelosi argues that he would not have received any discretionary bonus over what was guaranteed to him in the offer. Therefore, he believes that his total compensation would have been $1 million in 2005, which is $400,000 less than his 2004 SCM compensation. He asserts that discretionary bonuses above the guaranteed minimum amounts are never paid to traders. Pelosi argues that the Review Panel's "assertion that the discretionary bonus provided for an additional upside, ignor[es] the financial sector's reality that no trader, once having received a guaranteed minimum level of compensation, were [sic] afforded additional compensation through a discretionary bonus." (Opp. Mem. 21.)

The Review Panel relied directly on the language of the UBS offer in making its determination that the $1 million was the minimum amount of compensation Pelosi was guaranteed for 2005. The UBS offer in fact explicitly stated determinations regarding bonuses would be made by taking into account individual performance, performance of group and overall performance of UBS, but that the bonuses would not be less than the guaranteed amounts. Pelosi does not counter the plain language of the UBS offer with any evidence. Instead,

-15-

Pelosi asserts conclusorily that no trader has been awarded compensation above his minimum guarantee and cites his own affidavit and deposition in which he makes similar assertions for support. While Pelosi argues that the Review Panel's decision reflected a view that was completely out of touch with the reality of the market, he offers no proof that his own version of reality is correct or that the Review Panel ignored relevant evidence before it.

The Court agrees with the Review Panel that the UBS position was comparable to Pelosi's SCM employment. Pelosi's duties would have remained largely the same at UBS, with the additional responsibility of publishing research which the Court does not find dispositive. Pelosi's compensation under the UBS offer ($1 million guaranteed, with discretion for additional bonus payments) was similar to his compensation at SCM. Although the parties dispute the total amount Pelosi earned in 2004 from SCM, this dispute is not material because under either calculation the UBS offer falls within a similar range of total compensation, as required by the Plan's definition of "Comparable Position." As to commuting, Pelosi would have remained in the Jersey City location for the immediate future following the sale and he was given the option to leave UBS with severance benefits if he was asked to relocate. The Plan Administrator and Review Panel's decisions were based on the language of the Plan and were reasonable and

supported by substantial evidence. Even taking into account the possible influence of the conflict of interest arising from the fact that the Plan Administrator both made determinations regarding eligibility and paid claims, the denial of benefits appears reasonable. Summary judgment for Defendants is appropriate because Defendants have presented substantial evidence supporting the reasonableness of the Plan Administrator and Review Panel's decisions, and Pelosi has not raised any genuine issues of material fact regarding this issue. Under the deferential standard the Court has determined is applicable in this case, there is no basis to support a finding that the Plan Administrator's denial of benefits was arbitrary and capricious and thus should be overturned.

### III. ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the Court's Order dated March 20, 2009, is amended to incorporate the discussion set forth in this decision; and it is further

**ORDERED** that the motion (Docket No. 69) of defendants Charles Schwab Corporation and Charles Schwab Severance Pay Plan for summary judgment to dismiss plaintiff Vincent Pelosi's claims is GRANTED.

The Clerk of Court is directed to withdraw any pending

motions and to close the case; subject to its being reopened for the purpose of entertaining any motions for attorneys fees and costs, as appropriate.

**SO ORDERED.**

Dated: New York, New York
      30 June 2009

                                          Victor Marrero
                                            U.S.D.J.